UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at ASHLAND

CIVIL ACTION NO. 08-CV-58-HRW

CHRIS R. SHARPE                                                    PLAINTIFF

VS:                    **MEMORANDUM OPINION AND ORDER**

BRIAN PATTON, ET AL.                                              DEFENDANTS

     The Court considers the following matters in this proceeding:

     (1)    The "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment"
filed by counsel for Brian Patton, Traci Sanchez, and the United States of America ("the
defendants' Motion to Dismiss") [Record No. 42];

     (2)    The "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment"
filed by *pro se* plaintiff Chris R. Sharpe  ("Sharpe's Motion to Dismiss") [Record No. 43];

     (3)    The "Response" to Sharpe's Motion to Dismiss filed by counsel for the
defendants [Record No. 44]; and

     (4)    Sharpe's "Response" to the defendants' Motion to Dismiss [Record No. 45].

     For the reasons set forth below, the defendants' Motion to Dismiss as to the Eighth
Amendment will be partially granted and partially denied; Sharpe's Motion to Dismiss will be
denied; and this proceeding will be referred to Magistrate Judge Robert E. Wier.

PROCEDURAL HISTORY

     On April 11, 2008,  Chris R. Sharpe, proceeding *pro se*, filed a *pro se* civil rights action
asserting Eighth Amendment medical claims under: (1) 28 U.S.C. §1331, pursuant to the

doctrine announced in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), and

(2) the Federal Tort Claims Act, 28 U.S.C. § 1346(b), § 2680 ("FTCA").[1]

Sharpe named five defendants: (1) former FCI-Ashland Warden Brian Patton;[2] (2) the

BOP; (3) the Attorney General of the United States; (4) Dr. Traci Sanchez[3]; and (5) Michelle T.

Fuseymore.  Sharpe alleged that he injured his left knee on August 19, 2007 while playing

softball at the prison camp at FCI-Ashland. Sharpe claimed that the defendants violated his rights

under the Eighth Amendment of the United States Constitution by refusing to provide him with

the proper medical treatment for that injury. Alternatively, he claimed that the defendants'

actions constituted  negligence under the FTCA.

Sharpe also challenged the fact that his administrative grievances on the issue of his

medical treatment had been denied. To that extent, he asserted a construed due process claim

against Defendants Michele Fuseymore and the Attorney General of the United States of

America. Sharpe demanded injunctive relief in the form of an Order granting him and other

inmates temporary furloughs for medical treatment; evaluation by non-BOP medical provider;

unspecified compensatory damages; and punitive damages against the defendants, jointly and

severally [Record No. 2-3, p.2].

_____

[1]

When Sharpe filed this action, he was confined in the Federal Prison Camp located in Ashland, Kentucky ("FPC-Ashland"), Inmate Register No. 19890-058. The Bureau of Prisons ("BOP") website, www.bop.gov, Inmate Locator, reveals that Sharpe was released from federal custody on September 12, 2008. Sharpe now lists his current address as P.O. Box 630, Spencer, North Carolina, 28159.

[2]

The Court takes judicial notice of the fact that the current warden of FCI-Ashland is E.K. Cauley.

[3]This defendant now identifies herself as "Dr. Traci Sanchez-Vanhoose" [Record No. 42-4].

On January 12, 2009, the Court dismissed with prejudice Sharpe's Eighth Amendment official capacity claims against Defendants Brian Patton, Traci Sanchez, Michelle Fuseymore, and the United States Attorney General; dismissed with prejudice Sharpe's Fifth and Eighth Amendment individual capacity *Bivens* claims against the Attorney General of the United States; and dismissed with prejudice Sharpe's individual capacity Fifth Amendment claims against Defendant Michelle Fuseymore. The United States of America was added as a party with respect to the FTCA claims. The Court directed summons to issue with respect to the Eighth Amendment individual capacity claims asserted against Brian Patton and Traci Sanchez.

### 3. Defendants' Motion to Dismiss [Record No. 42]
#### A. FTCA Claims

The defendants argue that the Court lacks subject matter jurisdiction over the FTCA portion of the proceeding because the United States was not named as a defendant to this action. Alternatively, the defendants argue that Sharpe has failed to establish a breach of duty, which is the first element of negligence under Kentucky law. They contend that the medical records substantiate that the medical treatment provided to Sharpe was appropriate and within the standard of care. They argue that no genuine issue of material fact exists as to the FTCA claim.

#### B. Eighth Amendment Claims
#### Former Warden Patton

Defendant Patton denied Sharpe's administrative remedy request to be seen at the local VA and receive a medical furlough for treatment of his knees. Patton argues that under the doctrine of *respondeat superior*, he has no liability to Sharpe. Specifically, Patton argues that as Sharpe's custodian, he was neither directly involved in, nor responsible for, the decisions

3

which the prison medical staff made concerning medical treatment. Accordingly, he contends that summary judgment on his behalf is warranted.

## B. Dr. Traci Sanchez-Vanhoose

Dr. Sanchez-Vanhoose denied Sharpe's request for a specialty consultation with an orthopedic specialist. She argues that she did not violate Sharpe's Eighth Amendment rights because: (a) his knee condition was not a serious one, and (b) neither she nor anyone on the FCI-Ashland medical staff ignored, failed to treat, or were deliberately indifferent to his knee condition.

In her Declaration, Dr. Sanchez-Vanhoose discusses Sharpe's extensive medical records compiled while he was confined in the FCI-Ashland satellite camp. According to Dr. Sanchez-Vanhoose, the medical staff evaluated and treated Sharpe's condition on an ongoing basis and provided him with proper and necessary medical care during the entire time which he was confined at FCI-Ashland, from March 2007 through July of 2008 [Sanchez-Vanhoose Decl., Record No. 42-4]. She asserted that the denial of the orthopedic consultation with a specialist was the medically correct decision.

Dr. Sanchez-Vanhoose's detailed Declaration, summarized below, describes: (1) the condition affecting Sharpe's knees, and (2) the treatment provided to him during his period of incarceration at the satellite camp.

## Discussion of Sharpe's Medical Condition

When Sharpe arrived at the satellite camp at FCI-Ashland, he reported a past medical history of Degenerative Joint Disease (hereinafter "DJD") of the right knee, a condition which

he had for a number of years. Dr. Sanchez-Vanhoose explains that the symptoms of DJD include gradually developing pain and occasional joint swelling, principally in the weight-bearing joints of the lower extremities, *i.e.* knees. Pain, the earliest symptom, is usually worsened by bearing weight, but rest may relieve it. As DJD becomes more progressive, the pain can be constant. The disease is typically progressive as the patient ages, and it greatly varies in severity from person to person. DJD can be very minor in nature, where the patient can engage in high intensity physical activities without pain, or severe and advanced, where the patient has limited mobility and significant pain.

According to Dr. Sanchez-Vanhoose, surgical intervention, *i.e.* knee replacement, is a viable medical option only in the more severe stages of DJD. She states that standard medical treatment of DJD consists of prescriptions for anti-inflammatory drugs and Acetaminophen or other painkillers, although the patient may supplement prescription medications with over-the-counter painkillers. She further emphasizes that Patient Education is an important aspect to the treatment of DJD, examples of which are: advising the patient to avoid gaining weight; advising smokers to quit; issuing work-restrictions and medical idles; advising the patient to avoid activities which cause intense torsional and impact loading of the joints, and information on non-weight-bearing exercises.

This is the standard medical treatment for DJD, *i.e.*, treating the symptoms because there is no "cure" for condition and it is progressive in nature. Dr. Sanchez-Vanhoose explains that only in cases of severe DJD, where the patient has very limited mobility, is surgical intervention warranted. She states that joint replacement surgery may be in option in these severe cases.

Dr. Sanchez-Vanhoose characterizes Sharpe's case of DJD of the knees as being relatively minor in nature. She rejected surgery as a legitimate option, because Sharpe's condition was being adequately treated by the more conservative means which she outlined.

### Sharpe's Medical Treatment at FCI-Ashland

When Sharpe arrived at FCI Ashland on March 15, 2007, a clinician performed an initial physical examination of him. At that time, Sharpe complained of right knee discomfort and of chronic mild to moderate pain of the right knee. He stated that he had a long history of DJD and mentioned having had arthroscopic surgery in 2006. The clinician diagnosed Sharpe with having crepitus (a palpable or audible grinding of the joint produced by motion) of the right knee.

On May 23, 2007, Sharpe reported to sick call at the institution medical clinic complaining of right knee pain. The examination yielded unremarkable results. Sharpe was issued a knee wrap and was instructed to purchase Ibuprofen from the commissary.

About two weeks later, on June 7, 2007, Sharpe returned to sick call at the clinic, complaining of continued right knee pain which "worsens with damp weather and exposure to air conditioning." Sharpe told the clinician that the Ibuprofen did not help. The clinician prescribed Medrol (an anti-inflammatory steroid), and advised Sharpe to rest the knee and apply ice to reduce swelling.

When Sharpe reported to sick call on August 24, 2007, for an evaluation of his right knee, he complained that his right knee pain had increased during the past four to five days. Sharpe stated he had experienced chronic knee pain for the past twenty years, but he did not report suffering any acute injuries to his knees. The physical examination revealed edema (fluid

6

retention) in both knees, with the right knee greater than the left. The clinician prescribed

Prednisone and Naproxen (anti-inflammatory drugs) to treat the inflammation and pain. Sharpe

was also given a period of convalescence, and athletic/standing restrictions, and was instructed

to report to the clinic if his symptoms did not improve.

On September 5, 2007, x-rays were taken of both of Sharpe's knees. The X-rays showed

DJD of the right knee, described as narrowing of the patellofemoral space with mild spurring.

The x-rays showed Plaintiff's left knee was normal. Sharpe reported again to sick call at FCI

Ashland on September 14, 2007, for complaints of bilateral knee pain. The clinician found mild

edema in both knees, the right greater than the left. The clinician prescribed the

anti-inflammatory drug Naproxen.

Sharpe returned to the clinic again on October 15, 2007, for further evaluation of his

bilateral knee pain, which had apparently worsened. The clinician refilled the prescription for

Naproxen. When Sharpe reported to sick call again on November 2, 2007, for the same

complaints of bilateral knee pain, the clinician recommended that Sharpe be considered for an

outside orthopedic consultation.

On November 13, 2007, the Utilization Review Committee ("URC"), comprised of FCI

Ashland Health Services staff, including Dr. Sanchez-Vanhoose, reviewed recommendations for

specialty consultations and tests, including the request for an orthopedic consultation with a

specialist at the local Veterans Affairs ("VA") hospital. Based on the fact that Sharpe's DJD

knee problems were chronic and that the X-rays showed the DJD was relatively mild, the URC

concluded that there was no medical need, or potential medical benefit, for an outside orthopedic

7

specialist to examine or evaluate him. The URC determined that Sharpe was receiving the standard, appropriate treatment for the DJD condition from the clinicians at FCI Ashland. The URC further noted that Sharpe was approaching his release date and that he could follow-up with his primary care provider after his release in 2008.

Sharpe was seen again in the FCI Ashland medical clinic on November 28, 2007, where he was continued on the anti-inflammatory drug Piroxicam. Sharpe returned on December 11, 2007, and reported the pain and inflammation in his knee had improved after taking Piroxicam. Sharpe returned to the clinic again on January 2, 2008, complaining of pain, and stating he walked twenty minutes per day.

On January 24, 2008, Plaintiff had a follow-up appointment with Clinical Director Sanchez-Vanhoose. This was the first and only time Sanchez-Vanhoose directly examined Sharpe. During the examination, Sharpe stated that he had experienced DJD in his right knee for twenty years. Dr. Sanchez-Vanhoose further noted that Sharpe stated that he had injured his left knee while playing ball at FCI Ashland and that "it hurt ever since." Dr. Sanchez-Vanhoose further observed Plaintiff in the examination room and documented "while observing the patient in the room, the knee problems did not interfere with his ability to take his shoes off and on." [Sanchez-Vanhoose Decl., ¶18]. She further noted that Sharpe took his pants off without any assistance and without holding on to anything for support.

Dr. Sanchez-Vanhoose concluded that the examination was largely unremarkable, except for findings of mild crepitus (creaking sound) in both of Sharpe's knees, she noted that Sharpe had a stable gait and walked with a mild limp. Although Dr. Sanchez-Vanhoose ordered a more

comprehensive x-ray series of Sharpe's knees, she noted that Sharpe was able to ambulate and perform basic functions normally.  On January 29, 2008, the second set of x-rays was completed and revealed bilateral DJD, which was previously known, but no evidence of fractures or dislocations in Sharpe's knees.

Medical Personnel at the prison saw Sharpe several more times before his release. On February 29, 2008, he was seen at sick call for bilateral knee pain, and received the anti-inflammatory drug Piroxicam. On April 25, 2008, and July 2, 2008, he was seen at sick call for left knee pain, but  the examinations were unremarkable.  Sharpe left the satellite camp at FCI Ashland on July 22, 2008, for placement in a halfway house.

### 4. Sharpe's Motion to Dismiss [Record No. 43] Defendants' Response [Record No. 44]; and and Sharpe's Reply to Defendants' Response

In Sharpe's Motion to Dismiss, he argues that Dr. Sanchez-Vanhoose deliberately disregarded his serious medical condition affecting his left knee; failed to order a Magnetic Resonance Imaging ("MRI") test; and failed to refer him to an outside specialist for evaluation. Sharpe also reiterated his claim that former Warden Patton should be held responsible for denying his requests for outside evaluation.

Sharpe argues that the VA's decision to immediately order an arthroscopic evaluation of his left knee in November of 2008, then perform surgery on the left knee the following month, is evidence that Dr. Sanchez-Vanhoose pursued an ineffective line of treatment. Sharpe states that he continues to suffer daily and takes pain medications and anti-inflammatory medications.

Sharpe requested other forms of relief: an Order directing FCI-Ashland to authorize

9

furlough trips for inmates to outside doctors; an Order directing the United States Senate Archives to submit communication to former Senator Elizabeth Dole; the appointment of counsel to assist him in this case; and information as to "legal representation authorizations" received by counsel from the Department of Justice.

Finally, Sharpe stated that counsel for the defendants, Hon Marianna Jackson-Clay, Assistant United States Attorney for the Eastern District of Kentucky, certified that she mailed the defendants' "Motion to Dismiss" [Record No. 42] to him on March 25, 2009 but that he did not receive the filing until July 1, 2009. Sharpe alleges that counsel engaged in deceptive practices by allegedly filing a document in this Court on March 25, 2009, yet waiting until late June of 2009 to mail him a copy of the pleading. He alleges that he has been prejudiced by the perceived delay.

In response, the defendants stated that Dr. Sanchez-Vanhoose's Declaration established that all medical treatment rendered to Sharpe was correct, and that he had failed to substantiate his claims of deliberate indifference as required by *Napier v. Madison County, Kentucky*, 238 F.3d 739 (6th Cir. 2001). As to Sharpe's other claims, they responded that because this is not a class action, Sharpe lacked standing seek furlough authorization for other inmates in FCI-Ashland, and the request for his own furlough is now moot. They argued that this Court lacks jurisdiction to order a non-party to submit communications to Senator Elizabeth Dole and further noted that any information requested as to "legal representation authorizations received by counsel from the Department of Justice" are irrelevant and privileged. The defendants admitted that although the date on the Certificate of Service in their Motion to Dismiss was erroneous, the

document was in fact served on Sharpe on June 25, 2009 as shown by the postal marking, not

March 25, 2009. They asserted that the error did not prejudice Sharpe in any respect.

In his Reply, Sharpe again criticized Dr. Sanchez-Vanhoose for failing either to order an

MRI test or authorize more aggressive treatment for his left knee condition.[4] Sharpe contrasted

the medical treatment he received from the VA, once he was released from BOP custody, to that

which he had received while in confined in the camp at FCI-Ashland. He attached the medical

records showing that after his release, he was examined at the VA in Salisbury, North Carolina,

where an arthroscopic evaluation was undertaken in November of 2008 and surgery on his left

knee was performed in December of 2008.

DISCUSSION
A. Summary Judgment Standards

Federal Rule of Civil Procedure 12(b)(6) provides for a defendant to move for dismissal

for a plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P.

12(b)(6). A complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) only if there is

no law to support the claims, if the alleged facts are insufficient to state a claim, or if on the face

---

[4]

In his "Response" to Motion to Dismiss, Sharpe stated:

I was made to wait for almost a year suffering in pain as the Bureau's Medical
Department under the direction of Dr. Sanchez-Vohoos {sic} adamantly refused to allow
me to be seen by an Orthopedic Physician. I filed the appropriate Administrative
Grievances to no avail up to and inclusive of the Warden (Patton) disavowing and
further treatment. All the while I was making weekly visits to Medical for some type of
significant relief. It was I would contends deliberate indifference to me and my health.
To have received the appropriate medical expeditiously, I would not have had to endure
the pain until I was physically released from Ashland.

[Record No. 45, p.1].

of the complaint there is an insurmountable bar to relief. *See Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697 (6th Cir. 1978)); *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976).

The plain language of the rule requires that if the Rule 12(b)(6) motion has attachments which the Court considers, such as the declarations herein, then the motion "shall" be converted into a motion for summary judgment pursuant to Rule 56. *See Song v. City of Elyria, Ohio*, 985 F.2d 840, 842 (6th Cir. 1993).

As the Court has considered the sworn Declarations submitted by the defendants, it must also examine the standards for summary judgment. Summary judgment should be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007). The evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmovant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 245 (6th Cir.), *cert. denied,* 522 U.S. 967 (1997).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986). The significant question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986).

The moving party has the burden of showing there is an absence of evidence to support

a claim. *Celotex*, 477 U.S. at 324-25. After the moving party carries its burden, the non-moving

party must go beyond the pleadings to designate by affidavits, depositions, answers to

interrogatories, and admissions on file, specific facts showing that there is a genuine issue of

material fact for trial. *Id.* If the non-moving party completely fails to prove an essential element

of his or her case, then all other facts are rendered immaterial. *Id.* at 322-23. With these

standards in mind, the Court addresses the defendants' motion under Fed. R. Civ. P. 56.

### B. Certification Date in the Defendants' Motion to Dismiss

Counsel for the defendants admits that she erroneously certified that she mailed the

defendants' "Motion to Dismiss" to Sharpe on March 25, 2009 [*See* Record No. 42, p.29]. The

date on that Certification appears to have been in error, since the motion was not docketed until

*June 25*, 2009 [*Id.*]. It appears that counsel simply made a typographical error by stating that

service and filing had occurred on "*March 25*, 2009" instead of the "*June 25*, 2009" date. The

latter date was clearly the date on which the document was: (1) actually filed in this Court by

electronic means and (2) docketed as "filed" by the Clerk of the Court.

While this typographical error may have been confusing to Sharpe, he could not have

experienced any actual prejudice as a result the error. No activity ensued in this proceeding on

March 25, 2009. The Court did not receive or docket the defendants' Motion to Dismiss until

*June 25, 2009*. Sharpe's statement that he received the defendants' Motion to Dismiss on July

1, 2009 would be fully consistent with the actual filing of the document on June 25, 2009, and

his receiving same six days later, on July 1, 2009. Sharpe's argument on this issue is rejected

as without merit.

## C. Transfer Mooted Injunctive Relief Claim

Sharpe originally sought injunctive relief in the form of an Order directing former Warden Patton to release him on furlough or to transport him to an outside medical provider, of his choosing, for evaluation and treatment. Sharpe has since been released from federal custody.

An inmate's transfer to another prison moots his request for injunctive relief. *Lyons v. Azam*, 58 Fed. Appx. 85, 87 (6th Cir.2003) ("[A] prisoner's claims for injunctive relief become moot when the prisoner is no longer confined at the prison where the claim allegedly arose.") (citing *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir.1996)). *See also Jones v. Pancake*, 2007 WL 2407271, *2 (W. D. Ky., August 20, 2007) (where prisoner had alleged that prison officials had racially discriminated against him, prisoner's subsequent transfer to another facility mooted his Fourteenth Amendment claims and demands for injunctive relief, as the prisoner was "apparently no longer subject to racially discriminatory placement practices. . .").[5] Accordingly, Sharpe's demands for injunctive relief are moot.

## D. Eighth Amendment Claims against Former Warden Brian Patton

Sharpe alleges that Defendant Patton, as former Warden of FCI-Ashland, denied his administrative grievances seeking evaluation and/or treatment from outside providers, such as the VA.   Former Warden Patton responded that he was not doctor and that he neither

---

[5]

Case law from other federal circuits supports this conclusion, as well. *See McAlpine v. Thompson*, 187 F.3d 1213,1215 (10th Cir. 1999) (claims for injunctive relief are rendered moot upon release from confinement, or transfer to another facility) and *Green v. Branson*, 108 F.3d 1296 (10th Cir. 1997) (same).

administered treatment to Sharpe nor directly participated in his medical care [Patton Decl., Record No. 42-2].

In denying Sharpe's grievances requesting outside medical evaluation and treatment, Patton relied on the recommendations of trained medical staff who had concluded: (1) that Sharpe had received the most appropriate course of medical treatment for his DJD condition; and (2) that an outside medical consultation was not warranted. Patton further noted that the prison did not routinely authorize referrals to the VA for specialty consultations and that regarding Sharpe's case, his DJD did not warrant such a referral to maintain continuity in his medical care.

The claims for damages against Former Warden Patton must be dismissed for two reasons. First, the doctrine of *respondeat superior* is not a basis of liability in a *Bivens* action. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978); *Kesterson v. Luttrell*, 172 F.3d 48 (6th Cir.1998) (Table); *Jones v. City of Memphis*, 586 F.2d 622, 625 (6th Cir.1978). In order to find supervisors liable, a plaintiff must allege that the supervisor condoned, encouraged or participated in the alleged misconduct. *Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989); *Leach v. Shelby Co. Sheriff*, 891 F.2d 1241 (6th Cir. 1989), *cert. denied*, 110 S. Ct. 2173 (1990). A plaintiff must show "'that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994) (quoting *Bellamy v. Bradley*, 729 F.2d at 416,421 (6th Cir. 1984)).

Plaintiff Sharpe has failed to establish that Former Warden Patton was personally involved in the decisions concerning his medical treatment, other than denying an administrative

15

grievance based upon the recommendations of the medical staff. *Shehee v. Luttrell*, 199 F.3d 295, 300 (1999), holds that officials whose only action involve[s] the denial of administrative grievances, or the failure to act, are not liable under §1983.[6] Furthermore, there is no inherent constitutional right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467, 103 S. Ct. 864 (1983); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir.1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir.1994); *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir.1991).

Second, as to the *"respondeat superior"* aspect of Sharpe's medical claims, many prisoners before him have unsuccessfully claimed that BOP officials, who merely denied various requests during the administrative remedy process, violated their Eighth Amendment rights. The courts have consistently rejected such claims as lacking in merit. The denial of an administrative grievance/ appeal and the failure to remedy an alleged constitutional violation does not constitute sufficient involvement to establish liability under 42 U.S.C. § 1983 or *Bivens*. *Shehee v. Luttrell*, 199 F.3d at 300; *Barren v. Harrington*, 152 F.3d 1193 (9th Cir.1998); *Alder v. Correctional Medical Services*, 73 Fed. Appx. 839, 2 (6th Cir. 2003) (" Furthermore, defendants DeBruyn, King, and Naylor were involved solely by virtue of their denial of Alder's grievances. The mere denial of a prisoner's grievance states no claim of constitutional dimension.").

Accordingly, summary judgment in favor of Former Warden Brain Patton is warranted. There is no genuine issue of fact regarding his Eighth Amendment liability to Sharpe under the

---

6

*Bivens* is the judicially-created corollary to a 42 U.S.C. § 1983 claim. Under *Bivens*, a citizen may sue individual federal agents if he or she "suffer[ed] a compensable injury to a constitutionally protected interest." *Butz v. Economou*, 438 U.S. 478, 486, 98 S.Ct. 2894, 57 L. Ed.2d 895 (1978); *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L. Ed.2d 619 (1971).

standards set forth in *Celotex*, and under Fed. R. Civ. P. 56.

       E. Eighth Amendment Damages Claims Against Dr. Sanchez-Vanhoose

The Eighth Amendment contains both an objective and a subjective component. *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991). The objective component requires the existence of a "sufficiently serious medical need." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir.2004). The subjective component requires a plaintiff to show that "the official [knew] of and disregard[ed] an excessive risk to inmate health or safety, which is to say the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir.2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970 (1994)) (internal quotation marks omitted)).

The Court is persuaded that DJD is a serious medical condition, which finding satisfies the objective element of an Eighth Amendment claim (that the medical condition is sufficiently serious). Here, however, Sharpe has failed to satisfy the *subjective* prong of the claim (that Dr. Sanchez-Vanhoose disregarded an excessive risk to Sharpe's health or safety).

The record lacks any indication that Dr. Sanchez-Vanhoose was deliberately indifferent to Sharpe's medical conditions. On the contrary, the Court has recited the extensive history of medical treatment which Sharpe received at the prison. The medical staff was far from deliberately indifferent to his medical needs - - it was, in fact, quite responsive to his recurring medical needs.

Sharpe reported to the Health Service Department at least nine different times and was

17

provided medical treatment in accordance with his needs. The x-ray taken of his knees on September 5, 2007 (after the alleged August 19, 2007 injury to Sharpe's left knee while paying soft ball) revealed only mild degenerative changes in the right knee. Sharpe's physical evaluation on November 2, 2007 indicated stability of the knees and failed to reveal any edema. Sharpe was provided anti-inflammatory medications, such as naproxen, which he reported as having been helpful in reducing his pain.

When Sharpe was transferred to FCI-Ashland on March 15, 2007, he complained of discomfort and of chronic mild to moderate pain of the right knee. He stated that he had a long history of DJD and mentioned having had arthroscopic surgery in 2006. During the grievance process, he admitted that had a "recognized right knee disability" [Record No. 2-6, BP-8 Request]. As Dr. Sanchez-Vanhoose noted, strenuous physical or athletic exertions are not recommended for someone who suffers from DJD.

As person who had suffered from this degenerative condition for 20 years, Sharpe either knew, or should have known, that physical activity such as playing softball would have worsened his pre-existing DJD condition. Sharpe apparently disregarded precautions and engaged in activity which aggravated his pre-existing condition.

While Sharpe argues the medical staff refused to acknowledge that he had sustained an injury to his left knee while paying softball on the camp grounds on August 19, 2007, neither the medical records which Sharpe attached to his Complaint, nor Dr. Sanchez-Vanhoose's Declaration, indicate that Sharpe reported to Health Services staff that he had sustained an acute injury on that date. There is likewise no record that Sharpe reported an injury to the Recreation

Staff on that date.

The medical records Sharpe attached show that several days later, on August 24, 2007, he reported "C/O [increased] knee pain + 4-5 days" [Record 2-4, p.1] The physical examination revealed edema (fluid retention) in both knees, with the right knee greater than the left. The clinician prescribed Prednisone and Naproxen (anti-inflammatory drugs) to treat the inflammation and pain. Sharpe was also given a period of convalescence, and athletic/standing restrictions, and was instructed to report to the clinic if his symptoms did not improve [*Id.*, pp. 1-2]. The medical staff promptly responded to Sharpe's complaints and provided him with necessary medical treatment on this date, and all of the other dates Dr. Sanchez-Vanhoose discussed. While the medical treatment may not have been of the nature and extent that Sharpe preferred, it was provided to him, and it was provided in a prompt manner.

Sharpe asserts that because Physician's Assistant "M. Ramsey" suspected that he had sustained a torn meniscus in August of 2007, Dr. Sanchez-Vanhoose should have ordered an MRI test or sent him to the VA for evaluation and surgery. He further alleges that because the VA concluded that his condition warranted surgery on his left knee in August of 2008, that fact constituted *prima facie* proof that the defendants were deliberately indifferent to his medical needs between March of 2007 and July of 2008 [*See* VA Medical records, Record No. 21].

Here, the URC concluded in late 2007 that neither an outside evaluation, nor surgery, were required, based on the fact that Sharpe's DJD had not drastically worsened. Admittedly, the VA opted to perform surgery on Sharpe after release. But where one medical professional differs with another as to the course of treatment, the one offering more conservative treatment

19

does not act with either a "culpable state of mind" or with wantoness, under the subjective prong

of the Eighth Amendment. Differences of opinion as to matters of medical judgment, negligent

treatment or even medical malpractice are insufficient to state a claim under § 1983. *See Kelley

v. McGinnis*, 899 F.2d 612, 616 (7th Cir.1990); *Greer v. Daley*, 01cv000586, 2001 WL

34377922,at *3 (W. D. Wis., December 27, 2001) (Although petitioner believes that those

doctors who requested surgery are correct and those doctors who denied the surgery are

incorrect, this belief is not enough to show that the lack of surgery amounts to deliberate

indifference. To the contrary, the dispute indicates that the denial of surgery does not rise to the

level of an Eighth Amendment claim for inadequate medical care.").

When the cause of action is grounded not on an allegation that the prison official failed

to provide him with any treatment, but rather is grounded on an allegation that the prescribed

treatment was inadequate in some way, courts traditionally have been reluctant to second-guess

the medical official. *See, e.g., Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir.1995); *Westlake

v. Lucas*, 537 F.2d 857, 860 n. 5. (6th Cir. 1976). In *Westlake*, the Court distinguished between

a complaint alleging a complete denial of medical care and one where the prisoner was simply

second guessing medical judgments and attempting to "constitutionalize claims which sound in

state tort law."

Here, the URC's decision to deny Sharpe an outside evaluation did not constitute

deliberate indifference to Sharpe's medical needs. It may have, at best, qualified as a difference

of opinion or dispute as to the adequacy of treatment and the course of treatment prescribed, but

that dispute would not rise to the level of an Eighth Amendment claim under *Westlake*.

20

In *Alexander v. Federal Bureau of Prisons*, 227 F. Supp.2d 657 (E. D. Ky. 2002), this

Court addressed a prisoner's challenge to his medical treatment. Judge Danny C. Reeves entered

summary judgment in favor of the Bureau of Prisons, and stated:

> While it appears that the plaintiff has not gotten what he wants, what he wants is
> not the issue. Ordering a specific type of surgery is not the appropriate function
> of this Court. The Court agrees with the defendants that, at most the plaintiff has
> alleged a difference in opinion between the plaintiff and his health care providers
> regarding the expediency of a specific treatment. This does not generally create
> a constitutional claim.

*Id.* at 666. Under *Alexander*'s analysis, Sharpe has at best alleged a medical malpractice claim,

not a valid Eighth Amendment claim. *See also Durham v. Nu'Man* 97 F.3d 862, 869 (6th Cir.

1996) ("The Plaintiff's complaints go to the adequacy of the medical care; they do not raise an

issue of unnecessary and wanton infliction of pain as required under *Estelle*. They were not

deliberately indifferent to a serious medical need of the Plaintiff.").

Other cases have addressed whether the decision to deny additional medical treatment

(such as surgery) to an inmate who suffered from DJD qualified as an Eighth Amendment

violation. The cases have held that under similar facts, no Eighth Amendment claims were stated.

In *Cain v. Huff*, 117 F.3d 1420 (table), available at 1997 WL 377029 (6th Cir. (Mich.) Plaintiff-

Inmate Cain suffered from DJD. Two doctors who treated Cain disagreed as to whether surgery

was warranted. Cain asserted a § 1983 claim against Dr. Huff, the doctor who refused to

authorize the surgery. Dr. Huff's decision was based on the following considerations: (1) based

on the amount of Motrin he was taking and his mobility, Cain was not in severe or debilitating

pain; (2) based on Cain's age-forty-five-any surgery would probably have to be repeated when

Cain was older; and (3) based on the length of Cain's sentence and the lack of a prison job, total

hip replacement would not serve any rehabilitative purposes.

The district court determined that the plaintiff had, at best, set forth a claim challenging the adequacy of medical treatment, not an Eighth Amendment deliberate indifference claim. On appeal, the Sixth Circuit affirmed. *See also Kimble v. Kukua*, No. 3:05cv00310, 2008 WL 4443248, at *8 (S. D. Tex., September 25, 2008) (where plaintiff experienced knee problems and degenerative bone disease, he failed to establish that the defendants were deliberately indifferent to plaintiff's medical needs; plaintiff merely disagreed was and dissatisfied with his medical care); *Hillard v. Richardson*, No. 04cv03253, 2008 WL 660121, at *10 (D. Neb., March 6, 2009) (where plaintiff suffered from DJD, and demanded additional x-rays and an MRI, which the medical staff determined were unnecessary, his complaints regarding the treatment he received for his back injury amounted to a disagreement with a medical judgment, which was not enough to sustain an Eighth Amendment claim).

Accordingly, under these facts and the case law, no genuine issue of fact exists as to the Eighth Amendment claims asserted against Dr. Sanchez-Vanhoose. Summary judgment will be entered in her favor on those claims. Sharpe's Motion to Dismiss as to his Eighth Amendment claims will be denied.

### F. Sharpe's Other Claims

The defendants correctly argue that Sharpe's other claims and demands lack merit. Sharpe has no standing to ask the court to order FCI-Ashland to order furloughs for other prisoners, as this is not a class action and his is not the designated representative of other inmates at the prison.. This Court lacks jurisdiction to order a non-party, the United States Senate Archives, to

22

deliver communications to former Senator Elizabeth Dole.  Any information pertaining to "legal

representation authorizations received by counsel from the Department of Justice" would be

irrelevant, and as the defendants note, privileged.

### F. FTCA claims

Under the FTCA, a plaintiff may recover monetary awards from the United States for

injury, property loss, or death "caused by the negligent or wrongful act or omission of any

employee of the Government while acting within the scope . . . of employment." [28 U.S.C. §

1346(b)]. The United States may be held liable only if the conduct complained of amounts to

negligence "in accordance with the law of the place where the act or omission occurred." [Id.].

Here, the alleged negligent acts occurred, thus making Kentucky state tort law applicable to this

case. *Rayonier, Inc. v. United States*, 352 U.S. 315 (1957); *Spagnolia v. United States*, 598 F.

Supp. 683, 685 (W.D.N.Y. 1984).

For Sharpe to maintain an action for negligence against the United States, he must

establish the common law elements of negligence, namely that the BOP medical staff had a duty

to perform, that they failed to perform the duty, and that as a direct result of the failure, he was

harmed. The latter requirement is referred to as causation. *Rich For Rich v. Kentucky Country*

*Day, Inc.*, 793 S. W. 2d 832, 834 (Ky. App. 1990).  The absence of any one of these elements

is fatal to the claim. *M&T Chemicals v. Westrick*, 525 S.W. 2d 740 (Ky. 1974).

More specifically, in order to prevail in a medical malpractice tort suit under Kentucky

law, a plaintiff must prove two elements. First, he must show the challenged treatment was a

deviation below the applicable standard of care required and expected of a reasonably competent

23

practitioner; and, secondly, the alleged negligent act proximately caused the claimed injury. *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982); *William v. Tarter*, 151 S.W.2d 783 (Ky. App. 1941). Kentucky employs the "substantial factor" test in matters of causation and proximate cause. *Melvin Deutsch v. Shein*, 597 S.W.2d 141 (Ky. 1980).

Dr. Sanchez-Vanhoose's Affidavit establishes that no Eighth Amendment violation occurred. However, as noted, Sharpe reported to sick call again on November 2, 2007, with complaints of bilateral knee pain, and the clinician recommended the institution consider him for an outside orthopedic consultation. Sharpe has submitted his medical records from another federal agency, the VA in Salisbury, North Carolina, which show that the VA physicians immediately ordered, and performed, arthroscopic surgery to address a torn meniscus in the left knee [*See* Record No. 21].

In light of those facts, and the submitted medical records, the issue of negligence with respect to treatment of Sharpe's left knee are proper for further development. The defendants' Motion to Dismiss the FTCA claims will be denied. This matter will be referred to Magistrate Judge Robert E. Wier for all further disposition.

CONCLUSION

Accordingly, **IT IS ORDERED** as follows:

(1)    The "Motion to Dismiss or in the Alternative, Motion for Summary Judgment" filed by the defendants [Record No. 42] is **GRANTED IN PART** and **DENIED IN PART** as follows:

(A)    The "Motion to Dismiss" [Record No. 42] is **GRANTED** as to the

24

Eighth Amendment medical claims, which Plaintiff Chris R. Sharpe asserted against Defendants Brian Patton and Dr. Traci Sanchez-Vanhoose.

(B)     Plaintiff Chris R. Sharpe's claims against Defendants Brian Patton and Dr. Traci Sanchez-Vanhoose are **DISMISSED WITH PREJUDICE**. The Clerk is directed to note in the CM/ECF docket sheet that the claims against these defendants are "Terminated."

(C)     The defendants' "Motion to Dismiss"[Record No. 42] is **DENIED** as to the claims asserted against the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), § 2680(5).

(2)     The "Motion to Dismiss or in the Alternative, Motion for Summary Judgment" filed by plaintiff Chris Sharpe [Record No. 43] is **DENIED**.

(3)     This proceeding, 0:08-CV-58-HRW, is referred to Magistrate Judge J. Robert E. Wier pursuant to 28 U.S.C. § 636(b)(1)(A) for all further proceedings. The Clerk of the Court is directed to make the proper administrative referral notation(s) in the CM/ ECF docket sheet.

This the __11__ day of January, 2010.


HENRY R. WILHOIT, JR.
SENIOR U. S. DISTRICT JUDGE